UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

DEAN JOHNSTON,

        Plaintiff,

        v.                                  Case No. 19-C-734

ANDREW M. SAUL,
Commissioner of Social Security,

        Defendant.

---

## DECISION AND ORDER AFFIRMING DECISION OF COMMISSIONER

---

        Plaintiff Dean Johnston filed this action for judicial review of a decision by the Commissioner of Social Security denying his applications for a period of disability and disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act. Plaintiff claims that the administrative law judge (ALJ) erred in assessing his subjective complaints of pain and in determining his residual functional capacity (RFC). For the reasons that follow, the decision of the Commissioner will be affirmed.

## BACKGROUND

        Plaintiff protectively filed an application for a period of disability and disability insurance benefits on April 4, 2016, and an application for supplemental security income on July 28, 2015. R. 14. In these applications, Plaintiff alleged disability beginning on August 3, 2008; Plaintiff later amended his onset date to July 28, 2015. *Id.* Because his date last insured was December 31, 2013, the amendment eliminates his claim for disability insurance benefits and only his application for supplemental security income remains.

In his disability report, Plaintiff listed the following physical or mental conditions that limited his ability to work multiple lung nodules, chronic obstructive pulmonary disease (COPD), atypical seizure, coronary artery disease, hyperlipidemia, hematoma, tendinitis, ankle pain, lumbar radiculopathy, and chronic pain syndrome. R. 355. After his applications were denied initially and on reconsideration, Plaintiff requested a hearing before an ALJ. On August 16, 2018, ALJ John M. Dowling conducted a video hearing where Plaintiff, who was represented by counsel, and a vocational expert (VE) testified. R. 34.

At the time of the hearing, Plaintiff was 55 years old, divorced, and living with his 13-year-old daughter. R. 39–40. Plaintiff testified that he drives and attended two years of college. R. 40. Plaintiff described his past work history. He testified that in 2005, 2006, and 2007 he worked as a sales associate selling appliances. R. 43. He moved refrigerators and ranges in this job and spent eight to ten hours a day on his feet. *Id*. Plaintiff also worked selling fitness equipment, which involved moving treadmills and elliptical machines and installing saunas and whirlpools. R. 44. In 2008, he testified he worked for Get It Now—a rent-to-own company offering consumer goods—for one month as an account manager working in collections. R. 41–42. The job was mostly sedentary, but Plaintiff said he also occasionally went to repossess items. R. 43. In 2012, Plaintiff said he worked about 30 to 32 hours per week in maintenance for Fairway Apartments for three months. R. 41. Plaintiff also spoke about working as a sales associate for some time at Van Vreede's TV and Appliances. R. 44. It appears Plaintiff worked at Van Vreede's for about a dozen years, starting in 1993. R. 312.

Plaintiff testified that he stopped work in 2008 because of his physical health issues. R. 45. At this time, he had a ruptured right bicep tendon—making lifting difficult—and problems with his lower right lumbar and sciatica. *Id.* Plaintiff also described his history of COPD but said the

2

main reason he was let go from his job was his inability to perform its physical lifting requirements. R. 46. He has attempted to quit smoking, trying a nicotine patch and Chantix, but said he has been unsuccessful. R. 47.

The ALJ asked Plaintiff about his heart issues. Plaintiff said he has delayed needed surgery due to his mental and economic anxiety. *Id*. He testified that, at the time of the hearing, he was working part-time delivering newspapers and feared losing his home if he took time off from his job. *Id*. He was delivering newspapers five days per week. *Id*. Depending on the day of the week and the number of papers, the route would take him between one and three hours to complete. *Id*. Plaintiff was using his car to deliver the newspapers and some days the route also took longer due to breaks he needed. R. 47–48. He said if he were healthy, he could complete the newspaper route in 30 to 45 minutes. R. 51.

Plaintiff testified that he has been offered full-time jobs but cannot work more than three hours per day because of his physical symptoms, including shortness of breath and back problems. R. 48–49. He said he cannot walk two or three blocks; his breath becomes short after one block. R. 49, 52. Plaintiff takes Advair and Spiriva and uses a breathing machine multiple times per day and an inhaler. *Id*. Plaintiff stated he experiences chronic bronchitis two to three times per year, which requires medication. R. 50. He testified that he sleeps only an hour or two, then wakes up and needs to use a breathing machine. *Id*. He had not undergone a sleep study due to his work schedule. *Id*.

Plaintiff described his mood as depressed, and he has seen a counselor weekly for a couple years. R. 56–57. He said that, despite owning a home, his life started to fall apart and he began to have heart attacks, which has left him with half a heart and needing surgery. R. 57. Plaintiff

3

stated he does not receive help from his family, whom he "hates" and has disowned. R. 58. He testified that his brothers have done nothing except hurt him and put him down. *Id.*

During the hearing, the ALJ posed a hypothetical question to the vocational expert (VE), asking whether an individual with Plaintiff's age, education, and work experience who could perform a limited range of light work would be able to perform the relevant past work that Plaintiff had performed. R. 61. The VE said that Plaintiff could not perform the appliance sales job as previously performed but that he could perform it as the job is defined in the Dictionary of Occupational Titles (DOT). R. 62. The VE also testified that there were other jobs in the national economy that would accommodate the RFC, including a cashier and sales attendant. *Id*. The ALJ then asked what jobs would accommodate an additional sit/stand option. R. 62–63. The VE testified that storage facility rental clerk and mail clerk (non-postal) would be possible. R. 63. When asked if any transferrable sedentary work was available for Plaintiff, the VE testified there was none. *Id*.

In a fourteen-page decision dated November 13, 2018, the ALJ concluded that Plaintiff is not disabled. R. 14–27. The ALJ's decision followed the five-step sequential process for determining disability prescribed by the Social Security Administration (SSA). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 28, 2015, the alleged onset date. R. 16. At step two, the ALJ determined that Plaintiff had the following severe impairments: COPD, coronary artery disease, and degenerative disc disease of the lumbar spine. *Id*. At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 19.

4

Next, the ALJ assessed Plaintiff's RFC. He found that Plaintiff had the RFC to perform light work except that

> he can occasionally climb ramps or stairs and never climb ladders, ropes, or scaffolds. He must avoid concentrated exposure to the following: extreme heat; irritants such as fumes, odors, dust, gases, and poorly ventilated areas; unprotected heights; and hazardous machinery.

R. 20. At step four, the ALJ concluded, accepting the VE's testimony, that Plaintiff would be able to perform work in appliance sales as generally performed in the national economy, i.e., at a light exertional level and not at the heavy exertional level that Plaintiff previously performed it at. R. 26. Accordingly, the ALJ concluded that Plaintiff was not disabled. *Id.* The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. R. 1.

## LEGAL STANDARD

A claimant is entitled to disability benefits under Title II of the Social Security Act if he became disabled before the date he was last insured. 42 U.S.C. § 423(a)(1). To receive supplemental security income under Title XVI of the Social Security Act, a claimant must be disabled and have limited means. 42 U.S.C. §§ 1381(a), 1382. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The burden of proof in social security disability cases is on the claimant. 20 C.F.R. § 404.1512(a) ("In general, you have to prove to us that you are blind or disabled."). While a limited burden of demonstrating that other jobs exist in significant numbers in the national economy that the claimant can perform shifts to the SSA at the fifth step in the sequential process, the overall burden remains with the claimant. 20 C.F.R. § 404.1512(f). This only makes sense,

5

Case 2:19-cv-00734-WCG   Filed 12/15/20   Page 5 of 17   Document 23

given the fact that the majority of people under retirement age are capable of performing the essential functions required for some subset of the myriad of jobs that exist in the national economy. It also makes sense because, for many physical and mental impairments, objective evidence does not exist that would allow one to distinguish those impairments that render a person incapable of full-time work from those that make such employment merely more difficult. Finally, placing the burden of proof on the claimant makes sense because many people may be inclined to seek the benefits that come with a finding of disability when better paying and somewhat attractive employment is not readily available.

The determination of whether a claimant has met this burden is entrusted to the Commissioner of the Social Security Administration. Judicial review of the decisions of the Commissioner, like judicial review of all administrative agencies, is intended to be deferential. *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010). The Social Security Act specifies that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). But the "substantial evidence" test is not intended to reverse the burden of proof. In other words, a finding that the claimant is not disabled can also follow from a lack of convincing evidence.

Nor does the test require that the Commissioner cite conclusive evidence excluding any possibility that the claimant is unable to work. Such evidence, in the cases that go to hearing, is seldom, if ever, available. Instead, the substantial evidence test is intended to ensure that the Commissioner's decision has a reasonable evidentiary basis. *Sanders v. Colvin*, 600 F. App'x 469, 470 (7th Cir. 2015) ("The substantial-evidence standard, however, asks whether the administrative decision is rationally supported, not whether it is correct (in the sense that federal judges would have reached the same conclusions on the same record).").

6

The Supreme Court recently reaffirmed that, "[u]nder the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "The phrase 'substantial evidence,'" the Court explained, "is a 'term of art' used throughout administrative law to describe how courts are to review agency factfinding." *Id.* "And whatever the meaning of 'substantial' in other contexts," the Court noted, "the threshold for such evidentiary sufficiency is not high." *Id.* Substantial evidence is "'more than a mere scintilla.'" *Id.* (quoting *Consol. Edison*, 305 U.S. at 229). It means—and means only—"'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*

The ALJ must provide a "logical bridge" between the evidence and his conclusions. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). "Although an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) (citing *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir. 2009); *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004)). But it is not the job of a reviewing court to "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). Given this standard, and because a reviewing court may not substitute its judgment for that of the ALJ, "challenges to the sufficiency of the evidence rarely succeed." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005).

Additionally, the ALJ is expected to follow the SSA's rulings and regulations in making a determination. Failure to do so, unless the error is harmless, requires reversal. *Prochaska v.*

*Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). Finally, judicial review is limited to the rationales offered by the ALJ. *Shauger v. Astrue*, 675 F.3d 690, 697 (7th Cir. 2012) (citing *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010)).

## ANALYSIS

**A. Chronic Pain Syndrome**

Plaintiff contends that the ALJ erred in concluding that his chronic pain syndrome was not a severe impairment. At step two of the sequential evaluation process, the ALJ is to identify the claimant's medically determinable severe impairments. 20 C.F.R. § 416.920(a)(4)(ii). "[A] physical or mental impairment must be established by objective medical evidence from an acceptable medical source." *Id.* § 416.921. "An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities." *Id.* § 416.922(a).

In this case, the ALJ concluded at step two that Plaintiff had the following severe impairments: chronic obstructive pulmonary disease (COPD), coronary artery disease (CAD), and degenerative disc disease (DDD) of the lumbar spine. R. 16. The ALJ explicitly found that chronic pain syndrome was not one of Plaintiff's severe impairments. Although the ALJ stated that Plaintiff had been diagnosed with chronic pain syndrome, he concluded that it did not cause significant work-related limitations, and thus was not severe, because Plaintiff had "mostly normal strength, no gait instability, and normal extremities movement." R. 17. Plaintiff contends this was error. He asserts that, even if his chronic pain syndrome does not affect his physical abilities, it can adversely affect his mental capacities, cause fatigue, and thereby limit his ability to work.

Even if Plaintiff is correct that chronic pain syndrome can cause mental limitations and fatigue, any error the ALJ committed in determining Plaintiff's chronic pain syndrome was not

8

severe was harmless under the circumstances of this case. The step-two determination of severity is "merely a threshold requirement." *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999). Where, as here, the ALJ recognizes other severe impairments, he must continue the evaluation process and consider all limitations supported by the evidence. *Castile v. Astrue*, 617 F.3d 923, 927 (7th Cir. 2010); *see also Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) ("Having found that one or more of [appellant's] impairments was 'severe,' the ALJ needed to consider the aggregate effect of the entire constellation of ailments—including those impairments that in isolation are not severe."). That is precisely what the ALJ did here. He considered Plaintiff's complaints of pain, fatigue, and disability, including evidence bearing on his mental capacity, whether they resulted from chronic pain syndrome or one of the impairments the ALJ identified as severe. Any error in failing to identify chronic pain syndrome as a severe impairment was therefore harmless.

**B. Subjective Complaints of Pain and Disability**

Plaintiff claims the ALJ also erred in assessing his statements as to the symptoms that resulted from his various impairments. In considering a claimant's statements as to the intensity and persistence of his symptoms, the ALJ follows a two-step process. He first determines whether there is an underlying medically determinable physical or mental impairment or combination of impairments that could be reasonably expected to produce the claimant's pain or other symptoms. If so, the ALJ must then evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's functional capacity. 20 C.F.R. § 404.929; SSR 16-3p. The ALJ noted that Plaintiff's medically determinable impairments could reasonably be expected to cause his alleged symptoms but concluded that Plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms are not entirely consistent with the medical evidence and other evidence in the record. R. 20–21.

9

Citing *Shramek v. Apfel*, 226 F.3d 809 (7th Cir. 2000), Plaintiff asserts that the ALJ erred in referencing Plaintiff's continued smoking, despite his doctor's repeated advice to quit, as a reason for discounting Plaintiff's testimony regarding the severity of his COPD and associated breathing issues. In *Shramek*, the court found that the ALJ erred because he improperly interpreted the plaintiff's failure to quit smoking as failure to comply with her doctor's orders. *Id.* at 812; *see also* 20 C.F.R. § 404.1530(a). The court took issue with the ALJ construing the noncompliance statute as weighing on credibility. 226 F.3d at 812. It also stated in dicta that using a claimant's addiction to nicotine to impugn her credibility was "extremely tenuous." *Id.*

This case is distinguishable from *Shramek*, however, in that the claimant in that case did not have COPD, or even a lung condition. Rather, the admonishment to cease smoking was related to the potential exacerbation of her deep venous thrombophlebitis. *Id.* Here, the ALJ did not point to Plaintiff's continued smoking so much as "noncompliance" of any sort, but rather as behavior that called into question the claimed severity of his symptoms. The ALJ thought his continued smoking would not be expected "if his symptoms were as intense, persistent, and limiting as alleged." R. 24. Although the addictive power of cigarettes referenced by the court in *Shramek* might also help explain Plaintiff's continued smoking, one could argue that reasonable minds could disagree that such an addiction is so overpowering as to completely rule out the ALJ's assessment. Given the millions of smokers who have quit, the suggestion that it is beyond one's control appears tenuous to say the least.

But even if the ALJ should not have considered Plaintiff's smoking, the ALJ specified other reasons for finding that Plaintiff's symptoms were not as severe or as limiting as alleged. *See Hall v. Berryhill*, 906 F.3d 640, 644 (7th Cir. 2018) (noting that symptom analysis is not "patently wrong" when ALJ had "many specific reasons supported by the evidence"). As the

10

Commissioner points out, several medical experts opined that Plaintiff functioned better than he alleged and better than the ALJ found. The two state agency medical consultants opined that Plaintiff is limited to light exertion and never climbing ladders, ropes, or scaffolds. The ALJ incorporated these limitations into the RFC but rejected their further opinion that Plaintiff be limited to moderate exposure to hazards because he found the limitation inconsistent with the record. The ALJ nevertheless found that Plaintiff is reasonably limited in exposure to pulmonary irritants and extreme heat and limited ability to climb ramps or stairs, which are greater limitations that the consultants opined. R. 25.

The ALJ also cited the physical findings by the various doctors and medical professionals that examined Plaintiff over the course of his treatment. The ALJ noted that Plaintiff has gone to the emergency room multiple times for breathing difficulties, coughing, and shortness of breath, has been observed with very poor aeration and severely reduced mid-lung flows along with severe decrease in lung capacity, and has occasionally had reduced oxygen saturation rates, with readings such as 91% and decreased breath sounds. R. 21. The ALJ recognized that these clinical findings indicate that Plaintiff's COPD causes significant symptoms. He concluded that the visits to the emergency room and spirometry showing abnormal findings strongly suggest that Plaintiff's respiratory symptoms cause significant exertional and non-exertional limitations. In particular, observations of wheezing, reduced forced expiratory volume at one second, poor air movement throughout, moderate obstruction, distant breath sounds, coarse rhonchi, and prolonged expiratory phases across the longitudinal record suggest that Plaintiff is reasonably limited to light exertion, and such findings suggest that, to avoid exacerbation of Plaintiff's symptoms, he must avoid concentration exposure to extreme heat and irritants such as fumes, odors, dust, gases, and poorly ventilated areas. The ALJ also found that it is reasonable that increased exertion from Plaintiff's

11

respiratory symptoms contributes to limitations in climbing ramps or stairs as well as ladders, ropes, or scaffolds. Reports of syncope when coughing and difficulty ambulating, possibly due to respiratory or cardiovascular symptoms, reasonably suggest limitation in climbing ladders, ropes, or scaffolds. *Id.*

The ALJ found that further functional limitations were not supported. With regard to COPD, the ALJ noted that Plaintiff has consistently had oxygen saturations in the normal range, with values such as 95–99%. Even when Plaintiff has had pulse oximetry readings such as 94%, other readings within the same period were normal at 96–68%. While Plaintiff has had lower oxygen saturation readings such as 91% or 93%, the ALJ observed that, longitudinally, the record reflects mostly normal oxygen saturation, suggesting that Plaintiff's respiratory symptoms are not as intense, persistent, and limiting as alleged. R. 23.

The ALJ noted that exercise oximetry showed resting pulse oximetry of 95% on room air, that Plaintiff was able to walk 1,200 feet over the course of six minutes, that his nadir oxygen saturation on room air was 95%, and that there was no significant desaturation. The ALJ concluded these results suggest that Plaintiff retains more exertional and non-exertional capacity than he alleges. Plaintiff challenges the ALJ's reliance on his exercise oximetry. Plaintiff does not dispute that the ALJ accurately recounted the results of the exercise oximetry but rather asserts that the findings were not inconsistent with his testimony because he admitted that his oxygen was good. Plaintiff has not shown that the ALJ erred by concluding that this evidence appeared to suggest that Plaintiff's reports of extreme limitations in activities of daily living and work-related functional ability are overstated. The ALJ acknowledged that Plaintiff had abnormalities on pulmonary function tests, with some results showing severe reductions, but Plaintiff has also had good response with regard to forced expiratory volume after bronchodilation, indicating that, with

12

treatment, his symptoms are not as intense, persistent, and limiting as alleged. *Id.* The ALJ explained that in February 2016, Plaintiff's doctor noted that, despite moderate obstructive ventilator defect, Plaintiff had a quite brisk reversibility on bronchodilator, as he had on previous testing. In May 2016, spirometry was noted as stable over the last few months, with some response to bronchodilators. The ALJ noted that, even when a pulmonary function test showed decline in August 2016, after bronchodilation there was brisk response with nearly half a liter gained in forced expiratory volume at one second, representing a 34% change. *Id.*

The ALJ further noted that Plaintiff has had abnormal respiratory examinations but some of his symptom exacerbations have been short-lived. *Id.* As an example, the ALJ noted that on September 17, 2015, Plaintiff went to the emergency room for respiratory issues but was doing significantly better by September 21, 2015. The ALJ observed that at other examinations, Plaintiff had no signs of respiratory distress and no rales, rhonchi, or wheezing even when he went to the emergency room for respiratory symptoms. R. 24. Plaintiff asserts that, while these cited findings are accurate, the ALJ omitted the fact that the exam also found moderately decreased breath sounds located in the bases of both lungs. But the ALJ did acknowledge that Plaintiff exhibited decreased breath sounds. R. 21.

The ALJ observed that, in spite of wheezing on examination, Plaintiff's medical providers urged him to exercise regularly, which strongly suggests more functional ability than alleged. Plaintiff asserts that, "[w]hile proof of the ability to exercise can certainly be used to show a greater functional ability, what it appears the ALJ fails to appreciate is that regular exercise can be part of the course of treatment for COPD, and even those on supplemental oxygen are encouraged to regularly exercise." Pl.'s Br. at 21–22, Dkt. No. 9. The ALJ was entitled to consider these directions, and it was reasonable for the ALJ to conclude that his medical providers' belief that

13

Plaintiff was capable of performing regular exercise undercut Plaintiff's allegations of extreme limitations.

The ALJ noted that, in December 2015, findings of poor air movement were made in the context of Plaintiff not having taken Advair for one week, suggesting that, with treatment compliance, his symptoms are not as intense, persistent, and limiting as alleged. This is also consistent, the ALJ observed, with evidence of improvement of pulmonary function test results with bronchodilation. In April 2016, Plaintiff reported feeling significantly better when waking since starting Spiriva. R. 24.

Plaintiff essentially asks that the court reweigh the evidence and overrule the ALJ's opinion. This is not the court's role, however. Judicial review is intended to be deferential and the final decision of the Commissioner will be upheld if the ALJ applies the correct legal standards and supports his decision with substantial evidence. 42 U.S.C. § 405(g). The ALJ did so here.

## C. Functional Capacity Exam and Opinion of Treating Physician

Plaintiff asserts that the ALJ improperly discounted occupational therapist Jones' functional capacity evaluation and the associated opinion of Dr. Martis, Plaintiff's primary care physician. The ALJ noted that Plaintiff underwent a functional capacity evaluation in March 2016 for the purpose of proving his disability claim. The ALJ observed that the occupational therapist opined that Plaintiff was limited to a range of sedentary work with additional postural and other limitations and that Dr. Martis noted that the functional capacity evaluation yielded a work level of sedentary. R. 25. The ALJ gave the opinion little weight for four reasons:

> First, this opinion is based on a one-time examination, whereas the rest of the longitudinal record, discussed herein, provides a more accurate picture of the claimant's abilities and limitations. Second, the therapist noted that although the testing represented safe work abilities, the claimant's self-limiting performance indicates that abilities in some areas might actually be higher than demonstrated by the functional capacity evaluation. (Ex. C23F/78- 90). This significantly undermines

14

> the probative value of the opinion. Third, a reason for the evaluation was COPD, yet pulmonary function tests indicated quite brisk reversibility of moderate obstructive ventilator defect with bronchodilator. (Ex. C6F/36-38) (*See also* Ex. C2F/3-5; Cl lF/33). Fourth, exercise oximetry noted that the claimant was able to walk 1,200 feet over the course of six minutes with a nadir oxygen saturation on room air of 95%, i.e. no significant desaturation. (Ex. Cl8F/l). Such evidence strongly suggests that the limitations observed in the functional capacity evaluation are not representative of the *most* the claimant is capable of on a regular and continuing basis.

R. 25–26 (emphasis in original).

Generally, the ALJ must give "controlling weight" to the medical opinion of a treating physician on the nature and severity of an impairment if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "not inconsistent with other substantial evidence." *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010); 20 C.F.R. § 416.927(c)(2). If the ALJ decides to give lesser weight to a treating physician's opinion, he must articulate "good reasons" for doing so. *Larson*, 615 F.3d at 749. Stated differently, although an ALJ is not required to give the treating physician's opinion controlling weight, he is still required to provide a "sound explanation for his decision to reject it." *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013) (citations omitted). "If the ALJ does not give the treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009).

Although Plaintiff admits that Mr. Jones' opinion was based on a one-time examination, Plaintiff asserts that Dr. Martis, who was fully aware of the longitudinal record, reviewed the results of the functional capacity evaluation and accepted the findings as accurate. The Commissioner asserts that "it is unclear based on Dr. Martis' note whether she was ratifying Mr.

15

Jones' finding based on her independent knowledge, rather than merely noting the outcome." Def.'s Br. at 9, Dkt. No. 21 (citing R. 678). Even accepting, for the purpose of argument, that Dr. Martis *did* "accept" this finding, the Commissioner argues the ALJ provided additional good reasons for giving the opinion little weight. *Id*. The court agrees.

The ALJ also discounted the opinions because Mr. Jones found Plaintiff put forth a "marginally consistent effort" and noted that Plaintiff's "self-limiting performance indicates that abilities in some areas may actually be higher than demonstrated." R. 1432. Plaintiff argues that this is not a sufficient basis to discount the opinion because it only indicates a "possibility" that Plaintiff was not as limited as found. Pl.'s Br. at 23. Plaintiff cites to a functional capacity evaluation performed by Lisa Parish in May 2015 as evidence that similar results occurred when maximum effort was observed. But as Plaintiff concedes, the prior functional capacity evaluation was not performed by Mr. Jones and predated the alleged onset date of Plaintiff's disability. It was not improper for the ALJ to conclude that Mr. Jones' concerns regarding Plaintiff's self-limiting performance undermined the probative value of his findings.

In addition, the ALJ concluded the opinions were inconsistent with the medical evidence of record. Plaintiff asserts that the ALJ impermissibly "played doctor" in interpreting lab results and concluding those results were inconsistent with Mr. Jones' well-reasoned opinion. The Seventh Circuit has repeatedly cautioned that an ALJ "cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so" and "cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion." *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) (citations omitted). Far from playing doctor, the ALJ reviewed the treatment notes and findings of Plaintiff's medical providers and concluded those records were inconsistent with Mr. Jones's opinion. The ALJ cited pulmonologist Dr. Leonard's findings that

Plaintiff was able to walk 1,200 feet in six minutes without "significant desaturation." R. 25. The ALJ also cited spirometry results from a February 2016 pulmonary examination, but the ALJ did not interpret the results of that testing in finding it inconsistent with Mr. Jones' opinion. The ALJ's statement that Plaintiff's pulmonary testing represented "quite brisk reversibility of moderate obstructive ventilator defect with bronchodilator" was taken from Dr. Leonard's treatment notes. *Id.* It was not improper for the ALJ to conclude, after reviewing the treatment notes of Plaintiff's medical providers, that the medical evidence suggests that the limitations observed in the functional capacity evaluation are not representative of the most Plaintiff is capable of on a regular and continuing basis. The ALJ did not err in giving little weight to the opinion of Mr. Jones and Dr. Martis that Plaintiff was limited to a range of sedentary work.

## CONCLUSION

For the reasons above, the Commissioner's decision is **AFFIRMED**. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 15th day of December, 2020.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

17

Case 2:19-cv-00734-WCG   Filed 12/15/20   Page 17 of 17   Document 23